# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| FRIENDS OF MERRYMEETING BAY, DOUGLAS H. WATTS, and KATHLEEN McGEE, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Docket No. 1:11-cv-00167-NT |
| v. | ) ) | |
| NORMAN H. OLSEN, in his official capacity as Commissioner of the Maine Department of Marine Resources, | ) ) ) ) ) ) | |
| CHANDLER E. WOODCOCK, in his official capacity as Commissioner of the Maine Department of Inland Fisheries, | ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Friends of Merrymeeting Bay, Douglas H. Watts, and Kathleen McGee bring suit against Norman H. Olsen, in his official capacity as Commissioner of the Maine Department of Marine Resources and Chandler E. Woodcock, in his official capacity as Commissioner of the Maine Department of Inland Fisheries and Wildlife, alleging that paragraph 2 of the 2008 Alewife Law, 12 M.R.S.A. § 6134(2) (2008) ("**Alewife Law**"), which blocks alewife passage through the Grand Falls Dam into the St. Croix River watershed, is preempted by the Federal Water Pollution Control

1

Act of 1972, 33 U.S.C. §§ 1251-1387 (2006), known popularly as the Clean Water Act (**"CWA"**).

Plaintiffs seek a declaratory judgment that the Alewife Law is preempted by the CWA, an injunction prohibiting further implementation of the Alewife Law, and an injunction ordering the removal of existing barriers to alewife passage at the Grand Falls Dam. Defendants have filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted.

Plaintiffs argue in their Sur-Reply that the Court should convert Defendants' Motion to Dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d) because Defendants have introduced matters outside of the pleadings. The Court hereby excludes any matters outside of the Plaintiffs' Complaint for purposes of Defendants' Motion to Dismiss and does not convert Defendants' Motion to Dismiss into a motion for summary judgment.[1]

The Court finds that the Plaintiffs have failed to state a claim on which relief may be granted and GRANTS Defendants' Motion to Dismiss. Because the Plaintiffs have failed to state a claim on which relief may be granted, Plaintiffs' Motion for Summary Judgment is hereby DENIED.

---

[1] Plaintiffs have also filed a Motion for Summary Judgment. (Doc. No. 13). The Court extended the Defendants' time to repond to the Motion for Summary Judgment until after it ruled on Defendants' Motion to Dismiss. (Doc. No. 12).

## LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and that "each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2) & 8(d)(1). The First Circuit has set forth, consistent with *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), the "proper way of handling a motion to dismiss" under Rule 12(b)(6):

> Step one: isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements. Step two: take the complaint's well-pled (*i.e.* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.

*Schatz v. Republican State Leadership Committee*, No. 11-1437, 2012 WL 414264, at *4 (1st Cir. Feb. 10, 2012) (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that requires the reviewing court to 'draw on' our 'judicial experience and common sense.'" *Id*. (quoting *Iqbal*, 129 S. Ct. at 1950.)

## FACTUAL BACKGROUND

The Plaintiffs allege the following facts. Alewives, which include both the species of fish commonly known as alewives and blueback herring, are native to Maine waters. First Amended Complaint at ¶ 42. (**"Complaint"**) (Doc. No. 11). While alewives live at sea, they return to the fresh waters of Maine to spawn. *Id*. at

¶ 41. Historically, alewives were the most abundant of all the migratory fish that came up Maine's rivers. *Id.* at ¶ 44. Many species of fish, birds, and mammals eat alewives, and alewives provide cover from birds of prey when endangered Atlantic salmon migrate upstream. *Id.* at ¶ 43. Alewives are also commercially important as lobster bait. *Id.* at ¶ 44.

The alewife population declined during the last 200 years as a result of dams, pollution and overfishing. *Id.* at ¶ 45. In 1915, a dam was constructed on the St. Croix River at Grand Falls. *Id.* at ¶ 46. In 1964, a fishway was constructed at the Grand Falls Dam, which allowed alewives to pass and resulted in a resurgence of the alewife population. *Id.* at ¶ 50. Between 1981 and 1987, the number of alewives that returned to the St. Croix watershed to spawn increased from 169,000 to 2,625,000. *Id.*

The resurgence of alewives led to concern among people who fish for smallmouth bass that the increase in alewives was causing a decrease in smallmouth bass in Spednick Lake, located in the St. Croix watershed. *Id.* at ¶ 51. As a result, in 1995, the Maine legislature passed "An Act to Stop the Alewives Restoration Program in the St. Croix River," P.L. 1995, ch. 48, § 1 (emergency, effective April 27, 1995) without public comment. Complaint at ¶ 52. The 1995 Alewife Law stated that "the commissioner and the Commissioner of Inland Fisheries and Wildlife shall ensure that fishways on the Woodland Dam and the Grand Falls Dam, both located on the St. Croix River, are configured or operated in a manner that prevents the passage of alewives." P.L. 1995, ch. 48 § 1. In

4

compliance with the 1995 Alewife Law, the owner of the Grand Falls Dam installed a "stop log" to block access to the Grand Falls Dam fishway during the months when alewives migrate upstream. Complaint at ¶ 53.

The restriction of access to their spawning ground caused by the 1995 Alewife Law resulted in a "precipitous" decline in the alewife population in the St. Croix River. *Id.* at ¶ 54. Studies conducted in the 1990s, however, concluded that alewives do not have a negative impact on the smallmouth bass population. *Id.* at ¶¶ 55-56. In April of 2008, the 1995 Alewife Law was amended by "An Act to Restore Diadromous Fish in the St. Croix River," P.L. 2008, ch. 587, § 1 (emergency, effective April 9, 2008), which stated:

> This section governs the passage of alewives on the Woodland Dam and the Grand Falls Dam located on the St. Croix River.
>
> **1. Woodland Dam**. By May 1, 2008, the commissioner and the Commissioner of Inland Fisheries and Wildlife shall ensure that the fishway on the Woodland Dam is configured or operated in a manner that allows the passage of alewives.
>
> **2. Grand Falls Dam.** The commissioner and the Commissioner of Inland Fisheries and Wildlife shall ensure that the fishway on the Grand Falls Dam is configured or operated in a manner that prevents the passage of alewives.

P.L. 2008, ch. 587, § 1 (codified as amended at 12 M.R.S.A. § 6134 (Supp. 2011)).

As a result of the current Alewife Law and the blocked fishway at the Grand Falls Dam, alewives cannot access 98 percent of their spawning and nursery habitat in the St. Croix River basin and the alewife population in the St. Croix River is greatly depleted. Complaint at ¶¶ 60, 3.

5

## STATUTORY BACKGROUND

### I. The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA also seeks to attain "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." 33 U.S.C. § 1251(a)(2). The CWA's statutory structure requires the Environmental Protection Agency ("**EPA**") and state governments to work together to meet the CWA's goals. *See e.g.* 33 U.S.C. §1251(b).

#### A. Water Quality Standards

Under the CWA, states are responsible for establishing water quality standards for all of their water bodies. 33 U.S.C. § 1313(a)(1)-(3); 40 C.F.R. § 131.4 (2011). The EPA's duty is to review each state's standards, and either approve the standards, disapprove the standards, or promulgate its own standards if necessary. 40 C.F.R. §§ 131.5(a)-(b). Any water quality standard must include the designated uses of the waters and water quality criteria sufficient to protect the designated uses. 40 C.F.R. § 131.6.

> [W]ater quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water . . . .

40 CFR § 131.2; *see* 33 U.S.C. § 1313(c)(2)(A).

The water bodies involved in the instant case have been classified by the State of Maine as Class A, B, and GPA. 38 M.R.S.A. § 467(13) (Pamph. 2011). Those

classes all require the water to be suitable as a habitat for fish and other aquatic life.[2] Class A and GPA water must be "natural," which is defined as "living in, or as if in, a state of nature not measurably affected by human activity." 38 M.S.R.A. § 466(9) (2001). Class B requires that the habitat be "unimpaired," which is defined as "without a diminished capacity to support aquatic life." 38 M.R.S.A. § 466(11).

B. **Revision of Water Quality Standards**

When a state revises an existing water quality standard or adopts a new standard, the state must submit the revised or new standard to the EPA. 33 U.S.C. § 1313(c)(2)(A). The revised or new standard must state the designated uses of the navigable waters involved and provide the water quality criteria for the waters involved based upon the designated uses. "Revised standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes . . . ." *Id*. Pursuant to the CWA and its implementing regulations, the Maine legislature has established a water

---

[2] All of the pertinent classifications at issue require that the waters be of such quality that they are suitable for the designated uses of:

- drinking water after disinfection (Class A and GPA) or after treatment (Class B);
- fishing;
- agriculture;
- recreation in and on the water;
- industrial process and cooling water supply;
- hydroelectric power generation, except as provided under Title 12, section 403 (in the case of Class A and B);
- navigation; and
- as habitat for fish and other aquatic life.

38 M.R.S.A. §§ 465(2)(A), (3)(A), (4)(A), 465-A(1)(A) (Pamph. 2011).

7

classification system that vests sole authority in the Maine legislature to make changes to the classifications of Maine's state waters. 38 M.R.S.A. § 464(2)(D).

If a state wishes to create a sub-category of a designated use for a particular water body that will require less stringent criteria, the state must demonstrate to the EPA though a Use Attainability Analysis ("**UAA**")[3] that attaining the designated use is not feasible. 40 C.F.R. §§ 131.10(g), 131.20(c). States may not create a sub-category that removes an existing use[4] unless they are adding a use that requires more stringent criteria. 40 C.F.R. § 131.10(h)(1). The Maine legislature requires that the Maine Board of Environmental Protection conduct a UAA whenever the Board proposes to the Maine legislature the removal of a designated use or the adoption of a subcategory of a designated use that requires less stringent criteria. 38 M.R.S.A. § 464(2-A)(A)(2). Under Maine law, as required by the CWA, the Board may not recommend the establishment of a subcategory that removes an existing use. *Id.* at (B)(1).

EPA regulations require states to have an antidegradation policy. 40 C.F.R. § 131.12. According to the EPA's Water Quality Standards Handbook:

> No activity is allowable under the antidegradation policy which would partially or completely eliminate any existing use whether or not that use is designated in a State's water quality standards. . . . Water quality should be such that it results in no mortality and no significant

---

[3] A UAA is defined as "a structured scientific assessment of the factors affecting the attainment of the use which may include physical, chemical, biological, and economic factors as described in § 131.10(g)." 40 C.F.R. § 131.3(g).
[4] An existing use is defined as "those uses actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards." 40 C.F.R. § 131.3(e).

8

> growth or reproductive impairment of resident species. Any lowering of water quality below this full level of protection is not allowed.

EPA Water Quality Standards Handbook §4.4.2 (2nd ed. 2007). Even where the quality of a water body exceeds that necessary for its designated uses, the quality shall nonetheless be maintained and protected unless the state "after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process" finds that lower water quality is economically and socially important. 40 C.F.R. § 131.12(a)(2). Maine's anti-degradation policy provides that: "Existing in-stream water uses and the level of water quality necessary to protect those existing uses must be maintained and protected." 38 M.R.S.A. § 464(F)(1).

The EPA must approve new or revised state standards within 60 days or disapprove them within 90 days. 33 U.S.C. § 1313(c). If the EPA disapproves the state's new or revised standards, the agency has an additional 90 days to promulgate substitute standards, unless the state comes up with an alternative acceptable to the EPA. *Id.* The EPA has discretion to approve or reject the new or revised standards, but its duty to review a new or revised standard is mandatory. *Miccosukee Tribe v. EPA,* 105 F.3d 599, 602 (11th Cir. 1997) ("Even if a state fails to submit new or revised standards, a change in state water quality standards could invoke the mandatory duty imposed on the Administrator to review new or revised standards.")

Section 1365 of the CWA authorizes suits by citizens against "the Administrator where there is alleged a failure of the Administrator to perform such act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2).

## II. Plaintiffs' Preemption Argument

Plaintiffs allege that the Alewife Law is preempted by the CWA in three ways. First, they claim that the Alewife Law is an amendment to Maine's water quality standards for the St. Croix River, but that it was not submitted to the EPA for approval as required under the CWA. Second, they claim that the Alewife Law creates a less protective sub-category for the use of the waters above the Grand Falls Dam but that it was enacted without a UAA and EPA approval. Third, they claim that the Alewife Law was passed in violation of the CWA and of Maine's anti-degradation policy.

In their Motion to Dismiss, Defendants argue that the Alewife Law does not amend Maine's water quality standards for the St. Croix River and is instead a routine wildlife regulation well within the state's police powers. Defendants also argue that even if the Alewife Law is an amendment to Maine's water quality standards for the St. Croix River, the CWA explicitly grants states authority to amend water quality standards. Therefore, according to the Defendants, adopting an amendment to the state's water quality standards fits squarely within Maine's

authority under the CWA, and the Plaintiffs have not stated a cause of action for preemption.

Preemption is a concept grounded in Article VI, clause 2 of the United States Constitution, which provides that, "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land." U.S. Const. Art. VI cl. 2. The Supreme Court has recognized two general types of preemption: express and implied. *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98, 112 S. Ct. 2374, 120 L. Ed. 2d 73 (1992). "Preemption is strong medicine, not casually to be dispensed." *Grant's Dairy–Maine, LLC v. Comm'r of Maine Dep't of Agric., Food, and Rural Res.,* 232 F.3d 8, 18 (1st Cir. 2000). The Supreme Court has emphasized that preemption inquiries should be guided and to the greatest extent possible, controlled, by Congressional intent. *Gade,* 505 U.S. at 96 ("[t]he purpose of Congress is the ultimate touchstone" in preemption analysis and "[t]o discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute"); *Mass. Assoc. of Health Maintenance Orgs. v. Ruthardt,* 194 F.3d 176, 179 (1st Cir. 1999). The Plaintiffs put forward three theories of preemption – express preemption, implied field preemption and implied conflict preemption.

**A. Express Preemption**

Express preemption may lie when "a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion."

11

*Grant's Dairy,* 232 F.3d at 15 (citing *English v. Gen. Elec. Co.,* 496 U.S. 72, 78-79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990)). The Plaintiffs fail to point to any specific language in the CWA that expressly preempts the Alewife Law. They point only to the regulatory structure that requires states to submit proposed changes to EPA for review. But these requirements in the CWA do not expressly preempt a Maine law that would change a water quality standard.

### B. Implied Field Preemption

Field preemption occurs when the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947). In *Pharmaceutical Research and Manufacturers of America v. Concannon,* 249 F.3d 66 (1st Cir. 2001), the First Circuit specifically rejected a field preemption claim where "coordinated state and federal efforts exist within a complementary administrative framework." *Concannon,* 249 F.3d at 75 n.6. An inference that Congress intended to preclude state regulation is unreasonable in a cooperative federal and state program, particularly where the state is given primary authority to adopt regulations. *Id.* [5]

---

[5] Contrary to Plaintiffs' claim, this case is not identical to *Pacific Merchant Shipping Assoc. v. Goldstene*, 517 F.3d 1108 (9th Cir. 2008), which held that the Clean Air Act, 42 U.S.C. §§ 7401-7671(g) (2006), preempted California's Marine Vessel Rules, which were state promulgated emissions standards for diesel engines of ocean-going vessels. The structure of the CWA is different from that of the Clean Air Act, which expressly preempts state adoption of emissions standards for certain new engines in non-road vehicles. 42 U.S.C. § 7543(e)(1). For other non-road engines, the Clean Air Act permits California to seek EPA authorization to adopt emissions standards. *Pacific Merchant*, 517 F.3d at 1110; 42 U.S.C. § 7543(e)(2). In *Pacific Merchant*, the California Air Resources Board argued that the Marine Vessel Rules were not emissions standards, but rather in-use requirements, the adoption of which was expressly reserved to the states by the Clean Air Act. *Pacific Merchant*, 517 F.3d at 1115; 42 U.S.C. § 7543(d). The court found that the Marine Vessel

The Supreme Court has repeatedly characterized the CWA as a cooperative federal and state program.[6] The states have the authority to pass supplemental law in the area, in fact they have the primary responsibility to establish water quality standards.[7] The Plaintiffs have thus failed to state a claim for field preemption.

---

Rules regulated emissions and therefore fell within the field of prohibited state regulation absent EPA authorization under § 209(e)(2) of the Clean Air Act. *Pacific Merchant*, 517 F.3d at 1115. The CWA creates a regulatory scheme that not only permits but explicitly requires state adoption of water quality standards and anticipates federal promulgation of water quality standards only where the EPA has rejected a state's water quality standard and the state has failed to bring the standard into compliance with the CWA. 40 C.F.R. § §131.5(b), 131.21. S*ee Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1399 (4th Cir. 1993) ("primary responsibility for establishing appropriate water quality standards is left to the states . . . EPA sits in a reviewing capacity of the state-implemented standards, with approval and rejection powers only.") (internal citations omitted).

[6] *See e.g. PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 112 S. Ct. 1046, 117 L. Ed. 2d 239 (1992); *New York v. United States*, 505 U.S. 144, 167, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1991); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805, 93 L.Ed. 2d 883 (1987).

[7]  The CWA states:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.
>
> * * *
>
> It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall co-operate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs for managing water resources.

33 U.S.C. § 1251(b) & (g). Section 1370 provides:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this chapter, such State . . . or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance

## C. Implied Conflict Preemption

Conflict preemption occurs where there is an actual conflict between federal and state law — when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 10 L. Ed. 2d (1963), or where "state law interposes an obstacle to the achievement of Congress's discernible objectives," *Grant's Dairy*, 232 F.3d at 15 (citing *Gade*, 505 U.S. at 98).

The Plaintiffs have also failed to state a claim of implied conflict preemption. With a regulatory scheme in place that explicitly allows for state amendment of water quality standards, Plaintiffs have not described a conflict between the requirements of the CWA and the Alewife Law. The Alewife Law may well effect a change in the water quality standards,[8] and this revision may trigger EPA review of the Alewife Law, but it does not support a cause of action against the state for conflict preemption.

---

> under this chapter; or (2) be construed as impairing or in any manner effecting the right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370.

[8] The Court notes that Plaintiffs have cited several sources that suggest that blocking the upstream passage of fish thereby reducing the upstream fish population violates water quality standards with a designated use of fish habitat and a "natural" characterization. Fish passage "clearly bears on the attainment of the designated uses of fishing, recreation, and fish habitat." *Bangor Hydro-Electric Co. v. Board of Envtl. Prot.*, 595 A.2d 438, 443 (Me. 1991). Plaintiffs have also cited the Maine Department of Environmental Protection's 2010 Integrated Water Quality Monitoring and Assessment Report, reporting public comments supporting the Department's decision to list the Lower Androscoggin River as "impaired by a non-pollutant" because the Brunswick Dam on the River blocks shad passage and has decimated the upstream shad population. Maine Department of Environmental Protection 2010 Integrated Water Quality Monitoring and Assessment Report, p.17, available at http://www.maine.gov.

The EPA is under an obligation to review a law that changes a water quality standard regardless of whether a state presents it for review. In the event that EPA chooses not to review the Alewife Law, the Plaintiffs may sue the EPA under the citizen suit provision of the CWA. *Miccosukee Tribe of Indians of Florida v. EPA*, 105 F.3d 599 (11th Cir. 1997). In *Miccosukee*, the Eleventh Circuit held that the EPA has a mandatory duty to evaluate laws that effectively amend existing state water quality standards even when the state has neither submitted the law to the EPA as an amendment to water quality standards nor styled the law a water quality standards amendment. *Id.* at 603. In *Miccosukee*, the plaintiffs sued the EPA under § 1365. The plaintiffs alleged that Florida's Everglades Forever Act (EFA), a statute regulating phosphorous loads in the Everglades, amended Florida's water quality standards for the Everglades. The plaintiffs challenged the EPA's determination that the EFA did not effectively amend the standards. *Id.* at 601. The Eleventh Circuit held that the EPA has a mandatory duty to review potential effective amendments to water quality standards and remanded to the District Court to determine whether the EFA was an effective amendment to the water quality standards, [9] thereby requiring EPA review and approval. *Id.* at 602. *See also*

---

[9] The Eleventh Circuit held that in the absence of action by the Administrator,

> [T]he district court should have conducted its own factual findings. Because citizen suit jurisdiction depended on whether or not the EFA constituted new or revised state water quality standards, invoking a mandatory duty of the Administrator, the district court had to decide independently the effect of the EFA on existing state standards.

*Miccosukee Tribe*, 105 F.3d at 603. The Court believes it is premature to conduct factual findings in this case. EPA should have the opportunity to reach out and review this statute, and EPA should be a party to any suit alleging that the Alewife Act violates the CWA.

*Florida Pub. Interest Research Gp. Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070, 1091 (11th Cir. 2004) (Environmental group sued EPA to require the EPA to review Florida's Impaired Water Rule as a revised water quality standard; Eleventh Circuit remanded to the district court to determine whether the Impaired Waters Rule had the practical effect of amending Florida's water quality standards.)

The Plaintiffs have failed to state a claim on which relief may be granted. The CWA is structured to provide an administrative process for working out any conflicts between a state law and the CWA, and the citizen suit provision provides a safety net for correcting any administrative missteps that might occur along the way. This process must be given a chance to work. The CWA provides a clear way forward, and the Plaintiffs are required to follow it.

## CONCLUSION

Because the Court finds that the Plaintiffs have failed to state a cause of action on which relief may be granted, the Defendants' Motion to Dismiss is hereby GRANTED. Because the Plaintiffs have failed to state a claim on which relief may be granted, Plaintiffs' Motion for Summary Judgment is hereby DENIED.

SO ORDERED.

/s/ Nancy Torresen  
United States District Judge

Dated this 15th day of March, 2012.